[Civ. No. 6525. First Appellate District, Division One.—January 14, 1929.]

COAST COUNTIES REAL ESTATE AND INVESTMENT COMPANY (a Corporation), Respondent, v. MONTEREY COUNTY WATER WORKS (a Corporation), Appellant.

James F. Peck and Alan C. Van Fleet for Appellant.

Woolf & Thompson & John Thompson and C. F. Lacey for Respondent.

PARKER, J., *pro tem.*—This is an appeal from a judgment in favor of plaintiff and against defendant and comes to this court upon a bill of exceptions.

The facts of the case follow. In the year 1907 plaintiff, referred to hereinafter as the Realty Company, had bought

a tract of land in Monterey County. The purpose of the Realty Company was to subdivide the land and offer it for sale to the public. The area embraced some 1600 lots. As a necessity, water was required and there was none available to the tract. A corporation, predecessor of defendant, was then operating in Monterey County and engaged in the business of furnishing water to certain localities in said county. As there is no question presented on the distinction between the rights, duties, or liabilities of defendant and its predecessor, we will drop all mention of the predecessor and proceed as though the present corporation defendant has been the actual party contracting from the inception of the transaction. The defendant throughout will be styled Water Company. In 1907 the Water Company, in furnishing water to the localities served, employed wholly a gravity system. In other words, the point of supply was above the points of distribution. The land of the Realty Company was situated above the gravity line of the Water Company, and therefore could not be served thereby. The investment of the Realty Company was a total loss without water, and, therefore, it began intensive negotiations with the Water Company. Propositions and counter propositions were made, and finally a contract was entered into between the Realty Company and the Water Company, being the contract out of which arises the present controversy. The contract represents the only proposition the Water Company would make or consider at the time, and was agreed to by the Realty Company only with strenuous objection.

The contract may be thus summarized. It recites the fact that the Water Company had never undertaken to deliver water above its gravity line and that the lands of the Realty Company were above the said line. In consideration of the sum of $9,000 paid to the Water Company it agreed to construct (as far as the sum of $9,000 would go to pay therefor) a water system, including fire mains, distributing pipes, hydrants, electric motors, or such other power plant as may be deemed most advisable by the Water Company, pumps, tanks, and suitable buildings to contain the plant to supply water for the lands of the Realty Company. The mains and distributing pipes were to be laid subject to the direction of the Realty Company with reference to the particular portions of the lands to be reached and benefited thereby. As soon as the work was completed

(so far as the $9,000 would go toward completing the same) the Water Company agreed to operate the water system and pumping plant and to supply water to consumers upon the land of the Realty Company reached thereby at the same rates as to consumers below the gravity line, then being supplied by the Water Company. Thereafter as fast as the Realty Company should deposit with the Water Company the sum or sums necessary to defray the expenses of establishing and constructing additional water mains to extend said water system, and as requested by the Realty Company on lands owned by said Realty Company the Water Company would proceed forthwith to establish and construct such water mains as in the first instance, and thereafter operate the same and supply water to consumers upon land reached by such extensions at the same rates as in the first instance; provided, that at least the full cost of such extension must be deposited as aforesaid before any work of extension shall be begun.

It is covenanted and agreed between the respective parties hereto that in lieu of surety bonds guaranteeing to said Water Company the cost of operating said water system until such time as it shall became a paying investment, the entire sum of money deposited hereunder by the Realty Company with the Water Company, and such other sum or sums as may hereafter be deposited by the Realty Company with the Water Company for securing extensions, shall be held by the Water Company as a guarantee to secure said Water Company against any possible loss in the operating of said water system, and the return of such money shall be at the discretion of the Water Company, and any portions which it may see fit to return to the said Realty Company will be, by the Realty Company, received as satisfaction in full of all claims or demands which it may have against the Water Company for the return of said money; provided only that said Water Company shall have faithfully kept and performed all the obligations on its part to be kept and performed. In addition the Realty Company was to deed to the Water Company four lots for buildings and rights of way for pipe-lines and fire mains. It was especially understood that all covenants as to water rates in any lands situate within the corporate limits of the town of Monterey are subject to the ordinances of said town, regulating water rights therein. This agreement was dated March 6, 1907.

The Realty Company, in addition to the $9,000 paid at the time of the execution of the contract, advanced the sum of $3,750 for extensions, making a total of $12,750 received by the Water Company. There is no claim that the Water Company did not in all respects perform the obligation assumed by it, with reference to construction of works and distribution of water to the lands as contemplated in the contract. The controversy arises over the moneys paid or deposited. The Realty Company alleges that in 1919 the water system thus installed became and still is a paying investment and that under the contract the moneys paid are to be returned to the Realty Company, for which moneys the action is brought.

The Water Company contends that the contract imposes no obligation on it under any circumstances to return the money paid it by the Realty Company. · Incident to this the Water Company further contends that if it were liable for the return of any portion of the money, then under the contract it had the option to return the whole or any part thereof, which option it exercised. On the matter of the exercise of the claimed option it is found by the court, upon admission, that the Water Company offered to the Realty Company the sum of $10 as a full discharge of the money obligation, which offer was not accepted.

The issue thus presented brings us to a construction of the contract. All of the evidence as to prior negotiations and surrounding circumstances at the time of the execution of the contract have been recited. Neither party offered any other evidence to explain doubtful provisions of the contract or to illustrate just what the parties executing the contract had in mind. The secretary of the Realty Company, the officer of the said company who executed the contract in its behalf, was called as a witness. No one testified in behalf of the Water Company as to the circumstances surrounding the execution of the contract. We have therefore no extraneous aids to construction other than heretofore noted. In the early case of *Walsh* v. *Hill,* 38 Cal. 481, the court says: "The only rule of much value—one which is frequently shadowed forth, but seldom, if ever, expressly stated in the books—is to place ourselves as near as possible in the seats which were occupied by the parties at the time the instrument was executed; then, taking it by its four corners, read it." In *Eastman* v. *Piper,* 68 Cal.

App. 554 [229 Pac. 1002], it is said: "The intention is to be gathered from the four corners of the instrument. The rule that the intention is to be ascertained from the writing alone where the contract is reduced to writing is subject to other rules of interpretation of contracts. One of these is that 'a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.' (Sec. 1647.) Another rule is that the contract should be read in the light of the general intent of the parties and the object sought to be attained by them, and if any particular phrase or clause be repugnant to or inconsistent with what appears to be such underlying purpose and main intention, as gathered from a consideration of all of the provisions of the contract and the circumstances under which it was made, it should be rejected. This rule is stated by the code thus: 'Particular clauses of a contract are subordinate to its general intent.' (Civ. Code, sec. 1650.) Again: 'Words in a contract which are wholly inconsistent with . . . the main intention of the parties are to be rejected.' (Sec. 1653.)"

With these rules in mind we may proceed to a discussion of the contract here, with a view of determining the proper construction to be placed upon the instrument as a whole. At the time of the execution of the contract the Water Company was already formed and operating and in its operation was performing a public service. (Const., art. XIV, sec. 1.) The opening recital of the contract states as much. Throughout the record before us all parties concede this. Being so engaged, we consider the Water Company as a *quasi*-public corporation (*Pasadena* v. *Pasadena Water Co.,* 152 Cal. 579 [93 Pac. 490]). There is a lack of facts to establish exactly the nature of the Water Company's holdings or the character of its water appropriations. However, from the entire record and from the further fact that there is no claim to the contrary, we assume throughout that the company does not claim to be or to have been other than a public service corporation formed for the purpose of appropriating and distributing water to the area within which its appropriations were made and operating pursuant to the laws then in force. Indeed, if the water appropriated were claimed for such a use, then the right of the appropriator depended upon the user and the quantity that it could hold and claim would be dependent, then as now, upon

the present and reasonably anticipated necessity. The land of the Realty Company was located within an area susceptible of service, though not by means of the distributing system then in use.

The duty of the water company to furnish water to the land of the Realty Company was not unqualified. On the other hand, its right to refuse service was not absolute. The fact that a water company has undertaken to serve the entire municipality and that it would be of advantage to an inhabitant thereof, or a number of them, to have the water system extended to supply them would not of itself be sufficient to require or compel the company to make the extension. The duty which the water company has undertaken is of a public nature and to meet a public necessity for the supplying of water to the community. The obligation of the company is not to supply each or any number of inhabitants of the municipality in demand, as an absolute right on their part, but it has only assumed and become charged with the public duty of furnishing it where there is a reasonable demand for it and a reasonable extension of the service can be made to meet the demand. It would hardly be claimed that the obligation of a water company, exercising a public service franchise, would require it in the demand of an inhabitant of a city, or even a number of them, residing at a long distance from a point in the city to which its mains are already extended, to further excavate the streets of the municipality at its own expense and extend its mains to them, where the rates to be charged for the water to be delivered would but to a slight extent compensate the company for the expenditures entailed in doing so— in fact, without any certainty that there would be a continuous consumption of water or a continuous payment of rates even after it was brought to them. (*Lukrawaka* v. *Spring Valley Co.*, 169 Cal. 318 [Ann. Cas. 1917D, 277, 146 Pac. 640].) The law applicable is extensively reviewed in the cited case, which was a proceeding to compel the water company to furnish water to certain parties plaintiff. Applying the principles as therein enunciated to the situation existing at the time of the contract, the Water Company, under then existing conditions, could not have been compelled to furnish any water to the Realty Company lands inasmuch as this would have and did necessitate a complete new system of distribution. However, had the Realty

Company land been then subdivided and occupied by a population sufficient to warrant the expense of the change in the Water Company's system and to assure return on the necessary investment, then the demand for service made upon the Water Company could have been enforced.

Therefore the only valid reason that would justify the Water Company's refusal to serve water to the Realty Company lands, taking the fact to be that there was a sufficient supply, was the condition existing that by reason of expense of construction and lack of customers the expenditure incident to service was not warranted. With this reason removed there remained no other. Therefore, when sufficient assurance, by way of bond or deposit, was forthcoming, the duty of the Water Company to provide water for the Realty Company lands was enforceable.

This then, it is apparent, was the purpose of the written contract and its main purpose, namely, to secure water for the Realty Company lands and to insure the Water Company against a losing or unreasonable venture. The manner of securing against this loss ordinarily might have been by sufficient undertaking or deposit of money. The Realty Company did advance the money and the contract specifically states, to repeat, as follows: "It is covenanted and agreed between the parties that *in lieu of surety bonds* guaranteeing to said Water Company the cost of operating said water system until such time as it shall become a paying investment, the entire sum of money deposited hereunder by the Realty Company, and such other sum or sums as may hereafter be deposited by the said Realty Company with the Water Company for securing extensions, shall be held by the Water Company as a *guarantee* to secure the Water Company against any possible loss in the operating of said water system."

This provision leaves little room for doubt and requires no construction beyond the plain words thereof. The term "in lieu of surety bonds" simply means that instead of offering and delivering an acceptable bond or undertaking conditioned that upon the investment becoming a paying venture the obligation of the bond would be discharged, a cash deposit, upon the same condition, should be made. Throughout the provision the idea is further illustrated by use of the term "deposit" with reference to the sums advanced. The word "deposit" in itself conveys the idea

of the conditional delivery and is universally so understood. If the provision just quoted constituted all that the contract contained on the subject of the money, there would be need for no further comment thereon. Immediately following the language quoted and as a continuation thereof, without paragraphing or other constructional division, the contract reads, "and the return of such money shall be at the discretion of the Water Company, and any portion which it may see fit at any time to return to the said Realty Company will be by the latter received as satisfaction in full of all claims or demands which it may have against the Water Company, *provided only* that said Water Company shall have faithfully kept and performed all the obligations on its part to be kept and performed herein contained." Without question there is a conflict apparent in the two parts quoted.

An elementary rule of construction is that apparent conflicts should, if possible, be harmonized. Proceeding, with this in view, we find no difficulty in the phrase "at the discretion of the water company." The term "discretion" is to be construed as meaning an exercise of honest judgment, rather than arbitrary determination. This is the holding of our courts in *Nave* v. *Taylor,* 49 Cal. App. 311 [193 Pac. 508]; *Security Trust Co.* v. *Clausen,* 44 Cal. App. 734 [187 Pac. 142]; *Foster* v. *Young,* 172 Cal. 317, [156 Pac. 476]. Continuing this effort to harmonize, we read the remaining portion as though it were written thus: "and any portion of the money that the Water Company shall fairly determine to be returned shall be accepted as a full satisfaction of all demands." Thus harmonized, or to the extent harmonized, this construction supports the claim of the Realty Company here, that the money was and is a deposit to be returned to it whenever the investment became a paying one.

It is likewise a rule of construction, requiring no citation, that the construction placed upon a contract by the parties thereto may be considered in determining the true construction. There is evidence in the record before us that the moneys in question, advanced by the Realty Company under the contract, were carried upon the books of the Water Company in its general ledger, as a liability, namely, a deposit, consumer's deposit for the tract service. As a choice against the construction we adopt we have

the alternative of holding the moneys to be advanced as a mere donation or gift to the Water Company for the doing of that which the law implies is the purpose of its organization. (*Title Guarantee & Trust Co.* v. *Railroad Com.*, 168 Cal. 295 [Ann. Cas. 1916A, 738, 142 Pac. 878]; *Nourse* v. *Los Angeles*, 25 Cal. App. 384 [143 Pac. 801]; sec. 549, Civ. Code; *Munn* v. *Illinois*, 94 U. S. 113 [24 L. Ed. 77, see, also, Rose's U. S. Notes].) In passing, we refer to the defendant's motion for a nonsuit at the termination of plaintiff's case, wherein the sole ground stated was that the evidence offered by plaintiff failed to show that the system established for the land of the Realty Company had become a paying investment. It seems that the usual contact between law and justice will remain unbroken by a construction that places no unfair burdens on either party and harmonizes the words with the intent to the end that fairness and equality result. Should the harmonious co-relation of the various conflicts fail, then in accord with the rules announced and in conformance to a well-established canon of construction, where the general intent is manifest from the language of the contract, we may and do disregard entirely the conflicting portions which are repugnant to the intent as shown.

 Appellant next contends that the court erred in overruling its demurrer to the amended complaint of plaintiff, which demurrer raised the question of the statute of limitations. The action was instituted on April 21, 1924. The amended complaint alleged the execution of the contract, set forth *in haec verba,* in March, 1907. Alleged the payment of the advances, the last being in 1909. Then follows the allegation that on or about February 1, 1922, plaintiff learned, and alleges the fact to be, that said water system is a paying investment and has, at all times since the execution of the agreement, been a paying investment. That plaintiff on February 14, 1922, made demand for the return of the money deposited, which moneys the defendant has failed, refused, and neglected to return, etc. The ground of demurrer was that the action was barred under the provisions of section 337, subdivision 1, and section 343 of the Code of Civil Procedure. The cause of action set forth in the amended complaint may be thus summarized, for the purposes of this branch of the discussion. Plaintiff alleges that in 1907 it deposited with defendant a sum of

money to be held by defendant as a guarantee that a certain venture, to wit, a water system operated by defendant, would become a paying investment and upon the happening of such event the money was to be repaid. That in 1922 plaintiff learned that the investment had been a paying venture from the commencement and demanded the return of the fund, which demand was refused. Action commenced in 1924. Under the contract as pleaded the money was held by defendant purely by way of bond or guarantee and at no time became the property of defendant free from claim of plaintiff. At all times it remained the money of plaintiff and the possession of defendant was as a trustee for plaintiff or else as a mere depositary. It must have been and was a voluntary trust. Against such a trust the statute does not run until the trustee repudiates it. (*Arnold* v. *Loomis,* 170 Cal. 95 [148 Pac. 518]; *Norton* v. *Bassett,* 154 Cal. 415 [129 Am. St. Rep. 162, 97 Pac. 894].) The possession of a trustee is deemed to be that of the beneficiary, and the statute does not run against the *cestui que trust* in the case of an express and continuing trust so long as the trustee holds according to the understanding and does not repudiate the relationship. The statute does not begin to run until the trustee repudiates the trust and clearly and unequivocally brings home the fact to the beneficiary. (16 Cal. Jur. 427, and cases therein cited.)

We think that the amended complaint on its face did not show the action barred and that the allegations of the pleading were sufficient as against the demurrer. The statute was not pleaded in the answer, or otherwise, by way of defense.

The remaining question presented is whether or not the water system provided for in the contract ever became a paying investment. The trial court found that on January 1, 1919, the said system became a paying investment and ever since has continued to be a paying investment, but that prior to said date the Water Company sustained a loss in the operation of the system, amounting to $50. The judgment, following the findings, deducted this $50 from the amount deposited, as not being returnable.

By far the greater portion of the evidence offered was on the question of the return on the investment to determine its character as a paying investment under the terms of the

contract. Indeed, it cannot be denied that this was deemed by all parties as the main issue in the trial court.

Let us review that evidence. The lands of the Realty Company were referred to on the books of the Water Company as the Withers Tract, and all of the evidence on the question now under review so designated the lands. When, under the contract, the Water Company undertook to install a high-pressure system as distinguished from the theretofore used gravity system, many changes were necessary. At that time the Water Company determined, in view of the prospective growth and increasing population of Monterey County, that the necessity for a high-pressure system was apparent as a part of its general scheme of distribution. That is to say, it was determined as a matter of good business policy, that if a high-pressure system was to be installed, it would be unwise to confine its capacity to the needs, actual or anticipated, of the Withers Tract alone. Therefore, when the high-pressure system was installed, a much greater expense was incurred than the money advanced by the Realty Company, in fact, about double that amount. Where small water-mains would have sufficed, even the anticipated needs of the tract, larger ones were installed and the whole scheme or plan embraced and intended what is now admitted to be the case, namely, that the installation became and is an integral part of the entire distributing system of the Water Company, which serves with water some 60,000 people, and a total investment of over $1,000,000. In addition to the main plant there was also installed what is called a stand-by plant, intended to secure the service against breakdown or other interruption of service in the main plant. Also, the record discloses that in the Withers Tract are some 1600 lots, all in private ownership and all homesite lots.

Both appellant and respondent presented much evidence on the question of what constituted a paying investment and particularly applying the testimony to the investment under discussion. As is not unusual, the conflicting conclusions arise from practically the same facts. Both sides used the books and records of the Water Company as the basis of computation, and many elaborately prepared diagrams and schedules were prepared and submitted for the court's consideration. Should we take up these various and varying schedules and analysis charts, and attempt to classify each item therein, it would serve no useful purpose. As both sides

concede, figures may be made to perform strange antics. For instance, on a yearly basis of *pro ratio,* figuring the cost of upkeep proportionate to the Withers Tract uses a certain figure was set. The books over a period of seventeen years demonstrated that the estimate was fifty per cent correct. Likewise, in computing the burden of expense to be borne by the Withers Tract, as a unit in the distribution of water, taxes were computed which item taxes included the income taxes from the system as a whole. Without further dissection of the various charts, we conclude from a study of all of the evidence submitted that there was sufficient competent testimony adduced to support the conclusion of the trial court that the investment did pay.

Much of the argument is advanced on the theory that to constitute a paying investment it must be shown that there will be realized by the Water Company a return of at least six per cent on the sum invested, after allowing all of the items of chargeable expense, including maintenance, depreciation, and fixed interest charges on the depreciation amount found. While all of this argument might properly be addressed to a rate-fixing body or commission, we do not hold it to be our sole guide. The record discloses that the Water Company is operating as a public utility under the control and supervision of the Railroad Commission. In its reports to said commission it has presented the investment as a whole and in its several units, as well as including all sums chargeable to maintenance, depreciation, etc. We presume that in fixing rates and revenue a fair return, under the law, has been determined by that body. However, we are not restricted in our inquiry to a return of any fixed per centum. It is obvious, from the record, that the Water Company, at no time, would have nor would it now, in the exercise of a prudent business plan, abandon the high-pressure unit or the Withers Tract service for a return of the amount invested. Should the owners of the Withers Tract determine upon a local or mutual service and seek to condemn that much of the water system devoted to their use, the same figure would undoubtedly show a return on investment and a loss through severance, that would establish a value far above the deposit amount.

To repeat, if we should set forth in detail all of the items contained in the many schedules and determine the exact

accounting placement of each, with reference to proper charge as against the particular unit involved, we would end just where we began, and as all of the witnesses agree, in an approximation.

We accept the conclusion of the trial court, finding ample evidence to sustain it on this issue.

Judgment affirmed.

Cashin, J., and Knight, Acting P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 13, 1929, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 14, 1929.

All the Justices concurred.