Filed 1/7/25  Nelson v. Golden Queen Mining Company CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SETH ROBERT NELSON,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GOLDEN QUEEN MINING COMPANY, LLC,<br><br>Defendant and Appellant. | F086907<br><br>(Super. Ct. No. BCV-23-101611)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  David R. Zulfa, Judge.

Belden Blaine Raytis, T. Scott Belden, Kaleb L. Judy and Tyler D. Anthony for Defendant and Appellant.

Moon Law Group, H. Scott Leviant and Holly Williams for Plaintiff and Respondent.

-ooOoo-

Seth Nelson sued his former employer alleging multiple Labor Code violations and unfair business practices.  The employer moved to compel arbitration.  The trial court denied the motion, concluding the employer failed to demonstrate the existence of an executed arbitration agreement.  The employer appealed, contending the only objectively

reasonable construction of its employee handbook (which contained a two-page arbitration agreement) and the handbook acknowledgment signed by Nelson is that Nelson expressly assented to binding arbitration.

It is undisputed that Nelson signed the acknowledgment, which stated (1) "I understand that the guidelines contained in the Handbook are not intended to create any contractual rights or obligations, express or implied" and (2) "**My signature also acknowledges and certifies that I understand and voluntarily agree to terms of the Company Arbitration Agreement.**" The trial court determined these two provisions were sufficiently inconsistent and vague that it rendered the arbitration agreement unenforceable.

To resolve this appeal, we must consider the employee handbook and acknowledgment as a whole, apply California's rules of law for interpreting contracts, and determine whether an objectively reasonable person who signed the acknowledgment manifested an intention to consent to arbitration. Because the extrinsic evidence is not in conflict, this question is a legal issue subject to our independent review. Under the principle that apparent conflicts must be reconciled if reasonably possible, we conclude there is no actual conflict between (1) the disclaimer of contractual rights and obligations and (2) the agreement to the terms of the arbitration agreement because the disclaimer relates to "guidelines contained in the Handbook" and the arbitration agreement is not a guideline.

We therefore reverse the order denying the motion to compel arbitration and remand for further proceedings to address Nelson's unconscionability defense.

### FACTS

Appellant Golden Queen Mining Company, LLC (Queen Mining) is a California limited liability company that operates the Soledad Mountain gold and silver mine in Mojave, California. Queen Mining's operations use equipment, explosives and chemicals obtained from sources outside California. All the gold and silver recovered from the

2.

crushed ore is sold to a refinery outside California. Based on its purchases and sales, Queen Mining contends its business operations and Nelson's employment affected interstate commerce and, therefore, the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) governs the arbitration agreement.

Nelson was employed by Queen Mining from 2015 to October 2022. As part of Queen Mining's onboarding and orientation process, new employees are provided with written information and pamphlets, fill out various forms, and sign related acknowledgments. The documents provided to Nelson included Queen Mining's 31-page employee handbook dated 2015.

The employee handbook included an "**ARBITRATION AGREEMENT**" on pages 30 and 31. Its first paragraph stated that, with certain exceptions, the employee and Queen Mining agreed to submit any dispute regarding employee's employment to binding arbitration pursuant to the FAA, if applicable, or the California Arbitration Act (Code Civ. Proc., § 1280 et seq.). Reiterating aspects of this provision, the arbitration agreement's fifth paragraph stated: "Employee and Company agree that arbitration shall be the exclusive forum for resolving all disputes arising out of or involving the employee's employment with Company[.]"

One exception to arbitration stated in the first paragraph was for "any wage and hour matter within the jurisdiction of the California Labor Commissioner[.]" The fifth paragraph used additional language and stated exempt claims included "any wage and hour matter within the jurisdiction of *(and pursued with)* the California Labor Commissioner[.]" (Italics added.)

The arbitration agreement stated the dispute would be submitted to arbitration "within one year of the date the dispute first arose, or within one year of the termination of employment, whichever occurs first; provided, however, that if the employee's claim arises under a statute providing for a longer time to file a claim, that statute shall govern." The arbitration agreement also stated (1) the employee "waives the right to pursue claims

3.

in a class action capacity"; (2) nothing it contained modified or altered Queen Mining's policy of at-will employment; (3) the arbitration "section shall survive the termination of the employee's employment"; and (4) any portion of the arbitration agreement deemed unconscionable "shall be severed, but all remaining portions shall remain in full force and effect."

Page 32 of the employee handbook is a handbook acknowledgment. The entire text of the acknowledgment is set forth in part II.C. of this opinion. "Seth Robert Nelson" is handwritten on the acknowledgment's employee name line, "Seth Nelson" appears in cursive handwriting on the signature line, and "11-17-15" is handwritten on the date line. Nelson does not dispute that he signed the acknowledgment.

Another document provided to Nelson during his onboarding process was an "Employee Orientation Checklist." The checklist's left-hand column contained 10 items under the following heading: "I have received, filled out and returned to my employer." Handwritten check marks appear on lines for "Emergency Information Form," "Direct Deposit," and Forms W-4, DE-4, and I-9. The checklist's right-hand column listed 14 items under a heading stating: "I have received for my information." The initials "SRN" were handwritten next to 10 of the 14 items listed, including "Employee Handbook," "Arbitration Agreement," and "Corporate Governance." The lines at the bottom of the checklist for an employee signature and date were left blank. Some of the documents on the checklist are included in the record, including (1) the emergency information form signed "Seth R. Nelson" and dated "11/16/15"; (2) the one-page "Corporate Governance" document signed by Nelson and dated "11-17-15"; and (3) the "Drug and Alcohol Policy Acknowledgment" signed by Nelson and dated "11-17-15."

## PROCEEDINGS

In May 2023, Nelson filed a class action complaint against Queen Mining alleging causes of action for failure to pay minimum wages, pay overtime compensation, provide meal periods, authorize and permit rest periods, indemnify employees for expenses

4.

incurred in performing their jobs, pay all wages due upon termination, and provide accurate itemized wage statements. The complaint also alleged these failures constituted unlawful business acts and practices in violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.).

In August 2023, Queen Mining filed a motion to compel arbitration with three supporting declarations. The declaration of Queen Mining's human resources manager asserted that on November 17, 2015, Nelson signed a handbook acknowledgment and attached a copy of the signed acknowledgment as an exhibit. The declaration's other exhibits included the orientation checklist initialed by Nelson; the 2015 employee handbook containing the arbitration agreement; the emergency information form; the corporate governance document; and the drug and alcohol policy acknowledgment.

Nelson's opposition to the motion asserted no contract to arbitrate had been formed and, if formed, it was unenforceable. He argued (1) ambiguities in the employee handbook and the purported arbitration agreement imply no agreement exists; (2) the acknowledgment he signed stated nothing in the handbook created contractual obligations, express or implied; (3) the ambiguous acknowledgment should be construed against Queen Mining, its drafter; (4) the exception in the arbitration agreement for matters within the Labor Commissioner's jurisdiction should be construed against Queen Mining; and (5) the purported arbitration agreement was unconscionable because of its time limits for pursuing a claim.

Nelson's opposition papers included no declaration or other evidence contradicting the declarations submitted by Queen Mining. Also, he made no evidentiary objections to the statements made in Queen Mining's declarations.

Queen Mining's reply asserted Nelson signed an acknowledgment that unambiguously assented to the arbitration agreement, noted Nelson did not present any evidence to support his arguments, and it is unreasonable to interpret the arbitration agreement as excluding wage and hour claims that could have been pursued in court.

5.

Alternatively, Queen Mining argued that, if the arbitration agreement was ambiguous as to its scope, the applicable public policies supported resolving that ambiguity in favor of arbitration. Thus, Queen Mining concluded that, under the FAA, the trial court was required to order Nelson's individual claims to arbitration and dismiss the purported class claim.

In August 2023, the trial court held a hearing on the motion to compel arbitration. After the court announced its tentative ruling, heard argument, and the matter was submitted, the court denied the motion based on its determination that Queen Mining failed to demonstrate the existence of an executed arbitration agreement. Later that day, the court filed a statement of decision. The court's written order implementing the statement of decision and denying Queen Mining's motion to compel arbitration was filed in September 2023. Queen Mining appealed.

**DISCUSSION**

I.     BASIC LEGAL PRINCIPLES

    A.     <u>Formation of a Contract to Arbitrate</u>

Section 2 of the FAA provides in relevant part: "A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) Although federal policy favors arbitration agreements, "it is a cardinal principle that arbitration under the FAA 'is a matter of consent, not coercion.'" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*); see *Granite Rock Co. v. International Brotherhood of Teamsters* (2010) 561 U.S. 287, 299 [arbitration is strictly a matter of consent].) Therefore, a party cannot be forced to submit to arbitration any dispute that he or she has not agreed to arbitrate.

"In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law while giving due regard to the federal policy favoring arbitration." (*Pinnacle, supra*, 55 Cal.4th at p. 236.) In other words, the existence of a valid agreement to arbitrate is determined by reference to state law principles concerning the formation and enforceability of contracts. (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59; *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 906.)

The party seeking to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; see Evid. Code, § 115 [burden of proof].) In contrast, "the party opposing arbitration bears the burden of proving any defense, such as unconscionability." (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

The formation of a contract to arbitrate, like contracts generally, requires parties capable of contracting, the consent of those parties, a lawful object, and adequate consideration. (Civ. Code, § 1550.) In this appeal, the parties dispute whether Nelson consented to arbitration. Under Civil Code section 1565, the consent of the parties must be (1) free, (2) mutual, and (3) communicated by each to the other. (See *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270.) Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties—that is, courts analyze the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. (*Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 788 (*Esparza*).)

Both federal and state law require arbitration agreements to be in writing. (9 U.S.C. § 2; Code Civ. Proc., § 1281.) "A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact." (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

B.    Standard of Review

The standard of review applied to a denial of a motion to compel arbitration depends on the issues raised on appeal.  (*Bautista v. Fantasy Activewear, Inc.* (2020) 52 Cal.App.5th 650, 655.)  Where "the evidence is not in conflict, we review the trial court's denial of arbitration de novo."  (*Pinnacle*, *supra*, 55 Cal.4th at p. 236; see *DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813 ["Although mutual consent is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court"].)  In contrast, if the facts are in dispute, we review the record to determine if substantial evidence supports the trial court's factual findings.  (*Fleming v. Oliphant Financial, LLC* (2023) 88 Cal.App.5th 13, 18.)

Here, Nelson introduced no evidence, Queen Mining's evidence contained no internal conflicts, and the trial court's ruling was based entirely on an interpretation of the written documents.  (See *Romo v. Y-3 Holdings, Inc.* (2001) 87 Cal.App.4th 1153, 1158 [interpretation of written document is a question of law; employee handbook contained two separate and severable agreements, one of which was an agreement to arbitrate].)  Under these circumstances, we conclude the de novo standard of review applies.  (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978.)  The parties agree.

II.    BINDING AGREEMENT TO ARBITRATE

A.    Trial Court's Textual Analysis

The parties dispute whether the employee handbook and the handbook acknowledgment signed by Nelson should be interpreted to mean Nelson consented to the arbitration agreement.  The trial court determined the text of handbook acknowledgment was "inconsistent and therefore vague."  The court stated:  "Numerous cases land on the side of no agreement to arbitrate where the arbitration provision is contained within an employee handbook where the handbook states, like here, the handbook is not intended to be a contract."  The cases cited by the court included *Esparza*, *supra*, 2 Cal.App.5th 781; *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748 (*Mendoza*); *Sparks v. Vista*

8.

*Del Mar Child & Family Services* (2012) 207 Cal.App.4th 1511; *Ajamian v.
CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771; and *Romo v. Y-3 Holdings, Inc.*, *supra*, 87
Cal.App.4th 1153. The court summarized its analysis of the text of the employee
handbook and the handbook acknowledgment by stating:

> "Given the factual circumstances of the less than two page arbitration
> agreement being set forth within a 31 page handbook, the court is not
> persuaded defendant met its burden of demonstrating a binding arbitration
> agreement. The fact a signature is placed at the end of an employment
> handbook that includes language that the document does not create
> contractual obligations – but creates a binding arbitration agreement – is
> sufficiently inconsistent and vague that it renders the agreement
> unenforceable."

B.    Contentions of the Parties

As in the trial court, Queen Mining contends the only reasonable construction of
the language in the handbook acknowledgment agreeing to the terms of the arbitration
agreement is that Nelson expressly manifested his assent to the arbitration agreement.
Queen Mining refers to the acknowledgment's sentence that states "the guidelines
contained in the Handbook are not intended to create any contractual rights or
obligations, express or implied," and argues the phrase "guidelines contained in the
Handbook" does not include the arbitration agreement because the arbitration agreement
is not a "guideline."

Nelson contends Queen Mining's attempt to interpret "guidelines" to mean less
than the entire employee handbook fails because the language in the employee handbook
is not merely advisory but imposes mandatory obligations on the employees. In Nelson's
view, the only reasonable construction of the term "guideline" is that it "refers to all of
the provisions within the Employee Handbook," including the arbitration provision.

C.    Analysis of the Text

The fundamental goal of contract interpretation is to give effect to the mutual
intention of the parties as it existed when they entered the contract. (*Gilkyson v. Disney*

9.

*Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916.) When there is no conflict in the extrinsic evidence presented, identifying the objectively reasonable meaning of a document is a legal question. (*Admiral Ins. Co. v. Superior Court* (2017) 18 Cal.App.5th 383, 387.) To identify that objectively reasonable meaning, a document's language must be construed in the context of the instrument as a whole and in the circumstances of the case. (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; see Civ. Code, §§ 1641 [whole of a contract is to be taken together]; 1647 [circumstances under which contract was made]; Code Civ. Proc., § 1860 [when construing an instrument, consideration of circumstances under which it was made].) The language cannot be found to be ambiguous in the abstract. (*State of California v. Continental Ins. Co.*, *supra*, at p. 195.) Consequently, the fact a word or phrase can have more than one meaning when isolated from its context does not mean it is ambiguous when construed in the context of the whole instrument and the surrounding circumstances.

Here, the parties dispute whether the phrase "the guidelines contained in the Handbook" used in the handbook acknowledgment is reasonably interpreted to include the arbitration agreement contained in the handbook. Consequently, our analysis begins with the meaning of the word "guidelines." It is not defined in either the handbook or the acknowledgment. Merriam-Webster's Collegiate Dictionary "defines 'guideline' to mean 'an indication or outline of policy or conduct.' " (*Tracy Rural County Fire Protection Dist. v. Local Agency Formation Com. of San Joaquin County* (2022) 84 Cal.App.5th 91, 112.) Another dictionary defines it as follows: " 'A rule, principle, or general statement which may be regarded as a guide to procedure, policy, interpretation, etc., or (especially) as giving authoritative guidance. In later use often in plural: a set of such rules, statements, etc.' " (*Flores v. City of San Diego* (2022) 83 Cal.App.5th 360, 384, fn. 20.) These dictionary definitions show that, in the abstract, the term "guidelines" can have a range of meanings and, thus, is ambiguous—that is, it is reasonably susceptible to more

than one interpretation.  (See *Joseph v. City of Atwater* (2022) 74 Cal.App.5th 974, 982 [definition of contractual ambiguity].)

With the background provided by the foregoing dictionary definitions, we turn to the context in which the word "guidelines" was used.  The handbook acknowledgment signed by Nelson stated in full:

> "PLEASE READ THE HANDBOOK AND FILL OUT AND RETURN THIS PORTION TO HUMAN RESOURCES WITHIN ONE WEEK OF EMPLOYMENT.
>
> "I acknowledge that I have received a copy of the Golden Queen Mining Company, LLC Handbook.  I understand that I am responsible for reading the Handbook and for knowing and complying with the *policies* set forth in the Handbook during my employment with the Company.
>
> "I understand that the *guidelines* contained in the Handbook are not intended to create any contractual rights or obligations, express or implied.
>
> "I also understand that, except for the Company's at-will employment policy and the Arbitration Agreement, the Company may amend, interpret, modify, or withdraw any of the *provisions* of the Handbook at any time in its sole discretion, with or without notice.
>
> "**My signature also acknowledges and certifies that I understand and voluntarily agree to terms of the Company Arbitration Agreement.**
>
> "Furthermore, I understand that, because the Company cannot anticipate every issue that may arise during my employment, if I have any questions regarding the contents of the Handbook, I should consult Human Resources.
>
> "*I have carefully read this Acknowledgment.*"  (Italics added.)

The acknowledgment's first paragraph has little bearing on the meaning of the word "guidelines"—it simply directs the employee to read the handbook and fill out and return the acknowledgment.  The second, third and fourth paragraphs use three different terms to describe the contents of the handbook.  Respectively, those paragraphs refer to "policies set forth" in the handbook, "guidelines contained" in the handbook, and "provisions" of the handbook.  The use of the three terms—policies, guidelines, and

11.

provisions—raises the question whether they have the same meaning, different meanings, or some overlap.

Resolution of the precise relationship of all three terms, however, is not required to decide this appeal because the question presented is limited to whether the arbitration agreement is among "the guidelines contained in the Handbook[.]" If so, the arbitration agreement would not create any contractual rights or obligations enforceable in court. Nonetheless, the acknowledgment's use of the terms "policies" and "provisions" provides context for the specific question presented in this appeal.

The fourth paragraph sets forth Queen Mining's discretionary authority to unilaterally modify the "provisions of the Handbook" except for the "at-will employment policy and the Arbitration Agreement." This language necessarily implies the at-will employment policy and the arbitration agreement are among the "provisions of the Handbook." If they were not "provisions," there would be no point to including them in the exception. Stated another way, interpreting the word "provisions" to exclude the at-will employment policy, the arbitration agreement, or both would render part or all of the exception surplusage and violate the Legislature's directive to "give effect to every part, if reasonably practicable[.]" (Civ. Code, § 1641.)

If, hypothetically, the disclaimer in the acknowledgment's third paragraph stated the "provisions" (rather than "guidelines") of the handbook were not intended to create any contractual rights and obligations, it would be reasonable to interpret the disclaimer as including the at-will employment policy and the arbitration agreement. The disclaimer's actual use of the word "guidelines" rather than "provisions" implies that the word "guidelines" signified a narrower intention that, unlike "provisions," excludes the arbitration agreement. Consequently, we next consider whether other language in the acknowledgment and the handbook supports or undercuts this implication.

Additional context for the use of the term "guidelines" is the wording of the acknowledgment's fifth paragraph, which states: "**I understand and voluntarily agree**

12.

**to the terms of the Company Arbitration Agreement**.” This language refers to a specific section of the handbook with the heading “**ARBITRATION AGREEMENT**.” This heading also appears in the handbook’s table of contents. In comparison, no section in the handbook has a heading containing the word “guidelines” and that word does not appear in its table of contents. Thus, the phrase “terms of the Company Arbitration Agreement” is used in a specific sense and the word “guidelines” is used in the acknowledgment in a general sense. This usage supports the inference that the terms of the arbitration agreement and the guidelines are separate and distinct, rather than overlapping concepts.

Further context relevant to interpreting the acknowledgment’s text is the bolding and underlining of the language stating the employee’s agreement to the terms of the arbitration agreement. No other words in the acknowledgment are bolded and underlined. In the handbook, no words are both bolded and underlined, except for the heading “**F O R E W O R D**” centered at the top of page four of the handbook. As a result, the bolding and underlining calls the employee’s attention to the paragraph and suggests it is an important part of the acknowledgment, which supports the inference that objectively reasonable persons would expect the paragraph to be operative—that is, it actually defines the relationship between Queen Mining and the employee.

Having identified the textual context in which the disclaimer of contractual rights and obligations and the agreement to the terms of the arbitration agreement appear, we next consider how the rules of contract interpretation apply to those provisions. One well-established principle of contract interpretation provides that “when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision.” (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 834.) “The rule that the specific controls the general, however, applies only when the specific and general provisions cannot be reconciled.” (*Fremont Comp. Ins. Co. v. Superior Court* (1996) 44 Cal.App.4th 867, 873; see Civ. Code, § 1652

13.

[reconciling repugnancies in a contract].) These principles are important in this case because they frame the decisive question: whether the acknowledgment's third paragraph's disclaimer of the creation of contractual obligations can be reconciled with (i.e., is consistent with) the agreement to the terms of the arbitration agreement. (See *Coast Counties Real Estate & Inv. Co. v. Monterey County Water Works* (1929) 96 Cal.App. 269, 278 [apparent conflicts in a contract's language should, if possible, be harmonized]; see *Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1398 [courts are required to make every effort reasonably possible to give meaning and effect to every clause in the contract].)

Here, the acknowledgment's third and fifth paragraphs are easily harmonized by interpreting the word "guidelines" to exclude the arbitration agreement. We have located nothing in the text of the handbook itself that precludes this interpretation and establishes the wording of the acknowledgment is irreconcilable. Stated another way, although the arbitration agreement and the guidelines are among "the provisions of the Handbook" as that phrase is used in the acknowledgment, the arbitration agreement is not among the handbook's "guidelines" because "guidelines" are separate and distinct from the terms of the arbitration agreement. Consequently, the trial court's conclusion that the acknowledgment is internally contradictory constitutes legal error because it violates a well-established principle requiring apparent conflicts to be harmonized.

D.    <u>Case Law</u>

The next step of our analysis considers whether our interpretation of the acknowledgment contradicts California case law. As described below, none of those cases concluding an arbitration contract was not formed have interpreted the word "guidelines" to include an arbitration agreement contained in an employee handbook.

In *Esparza*, *supra*, 2 Cal.App.5th 781, the employee handbook was 52 pages, and the last two pages were identical copies of a "policy acknowledgment," except one was

labeled as the employer copy and the other was labeled as the employee copy. (*Id*. at p. 785.) "A section titled 'Agreement to Arbitrate' spanned pages 3 and 4 of the employee handbook." (*Id*. at p. 784.) The agreement to arbitrate did not have a separate signature block. The policy acknowledgment provided in part:

> " 'This handbook is designed to provide information to employees of Sand & Sea, Inc. (Shore Hotel) regarding various policies, practices and procedures that apply to them including our Arbitration Agreement. Shore Hotel and its employees acknowledge that their relationship is 'at will' and that either party can terminate that relationship at any time for any reason. Shore Hotel reserves the right to modify, alter or eliminate any and all of the policies and procedures set forth herein at any time, for any reason, with or without notice. Neither this manual nor its contents constitute, in whole or in part, either an express or implied contract of employment with Shore Hotel or any employee.' " (*Esparza*, *supra*, 2 Cal.App.5th at p. 785.)

The acknowledgment did not mention the agreement to arbitrate. The first page of the handbook, which the court described as the welcome letter, included the following sentence:

> " 'Employees should understand, however, that this handbook is not intended to be a contract (express or implied), nor is it intended to otherwise create any legally enforceable obligations on the part of the Company or its employees. The Company reserves the right to revise, modify, delete, or add to any and all policies, procedures, work rules, or benefits stated in this handbook or in any other document at any time (except as to its at-will employment policy) without prior notice.' " (*Esparza*, *supra*, 2 Cal.App.5th at p. 784, italics omitted.)

The disclaimer of contractual obligations in *Esparza* was more broadly worded than the disclaimer in Queen Mining's employee handbook and acknowledgment. The disclaimer in the welcome letter in *Esparza* refers to "this handbook[.]" (*Esparza*, *supra*, 2 Cal.App.5th at p. 784.) The acknowledgment's disclaimer referred to "this manual [and] its contents." (*Id*. at p. 785.) In contrast, the disclaimer in Queen Mining's acknowledgment is limited to "guidelines contained in the Handbook." As a result, the court in *Esparza* did not decide the specific issue of interpretation presented by Queen

15.

Mining's handbook.  Therefore, *Esparza* is not precedent for interpreting the word "guidelines" to include an arbitration agreement contained in the handbook.

A second important distinction between Queen Mining's acknowledgment and the policy acknowledgment in *Esparza* is the policy acknowledgment did not explicitly state the employee agreed to abide by the arbitration agreement within the handbook. (*Esparza*, *supra*, 2 Cal.App.5th at p. 790.)  Here, Nelson signed an acknowledgment stating in bolded and underlined text that he both understood and agreed to the terms of the agreement to arbitrate and that he had "carefully read this Acknowledgment."[1]

Based on these two differences in the wording of the relevant documents, we conclude *Esparza*'s analysis and conclusion does not conflict with our determination that there is no irreconcilable conflict between Queen Mining's acknowledgment's statement that the guidelines did not create any contractual rights and obligations and its statement that the employee voluntarily agrees to the terms of the arbitration agreement.

In *Mendoza, supra,* 75 Cal.App.5th 748, the parties disputed whether the employee agreed to arbitration when he signed two handbook acknowledgment forms. (*Id*. at p. 782.)  The appellate court upheld the trial court's determination that the parties had not entered into an express agreement to arbitrate, stating:

---

[1]     During oral argument, Nelson's counsel argued the language in the acknowledgment stating "I understand that I am responsible for reading the Handbook" meant the employee was not expected to have read the handbook when the acknowledgment was signed, but could read the handbook (including the arbitration agreement) later.  This view of when the arbitration agreement was to be read by Nelson is contrary to Nelson certifying that he understood and voluntarily agreed to the terms of the arbitration agreement.  Generally, it is not possible to understand terms without knowing what they are, and this knowledge usually is acquired by reading the arbitration agreement.  Thus, the certification of understanding establishes that he read or otherwise acquired the knowledge of the terms of the arbitration agreement before signing the acknowledgment.  Consequently, his signature adequately establishes his assent to the arbitration terms.

"Nothing in the acknowledgment forms notified Mendoza either that the Handbook contained an arbitration clause or that his acceptance of the Handbook constituted a waiver of his right to a judicial forum in which to resolve his wage and hour claims. [Citation.] Since the Handbook 'was informational rather than contractual' and [employer] failed to call attention to the arbitration requirement in the acknowledgment form, Mendoza should not be required to arbitrate. [Citation.] Merely agreeing to abide by all applicable rules and policies and to 'read, observe and abide by' the contents of the Handbook that 'is designed for quick reference and general information' does not constitute a contract and does not bind the employee to arbitration." (*Mendoza*, *supra*, 75 Cal.App.5th at pp. 786, 788.)

In *Sparks v. Vista Del Mar Child & Family Services, supra,* 207 Cal.App.4th 1511, abrogated on another ground as stated in *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 385-390, the employer moved to compel arbitration based on arbitration provisions in two employee handbooks from 2006 and 2009 and an acknowledgment signed by the employee in 2006. There were no signature lines for the arbitration clauses in either handbook, and "the acknowledgment form did not reference the arbitration clause, much less advise plaintiff that he would be bound by it." (*Sparks*, *supra*, at p. 1522.)

In *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, the employee signed an annual acknowledgment and certification stating she had read the employer's policies and procedures manual. (*Id*. at p. 776.) The manual was a 65-page document that included (1) an employee handbook that contained a section titled " 'Arbitration Agreement and Policy' "; (2) a form confirming receipt of the handbook and acknowledging claims and disputes were subject to arbitration; (3) an arbitration agreement and policy, which contained a line for the employee's signature; (4) a confidentiality agreement and exhibits. (*Ibid*.) The employee "did not sign the acknowledgement of her receipt of the employee handbook and agreement to arbitrate. Nor did she sign the arbitration agreement and policy." (*Ibid*.)

In *Romo v. Y-3 Holdings, Inc.*, *supra*, 87 Cal.App.4th 1153, the employee handbook included a section titled " 'Mutual Agreement to Arbitrate Claims' " on pages

17.

39 through 41 with page 41 also containing lines for dates and signatures of the employee and the employer. (*Id*. at pp. 1155–1156.) Those lines had not been signed or dated. (*Id*. at p. 1156.) In contrast, the employee acknowledgment at the end of the handbook had a place for a date and signature by the employee, which the plaintiff had signed. (*Ibid*.) Unlike Queen Mining's document, the signed employee acknowledgment in *Romo* did not mention the arbitration agreement. The trial court denied a motion to compel arbitration, concluding the arbitration provisions in the handbook could not be enforced. (*Id*. at pp. 1157–1158.) The appellate court affirmed the order denying arbitration. (*Id*. at p. 1160.) The court concluded the arbitration provisions, with its separate signature lines for both parties, was meant to be a stand-alone agreement that was effective only if both parties assented to the arbitration provisions. (*Ibid*.)

We conclude *Mendoza*, *Ajamian*, *Sparks* and *Romo* are distinguishable from the facts of the present case because (1) the employees in those cases did not sign an acknowledgment explicitly agreeing to the terms of the arbitration agreement and (2) the meaning of the word "guidelines" was not an issue. As a result, our interpretation of the acknowledgment signed by Nelson does not conflict with those cases.

III.     REMAND FOR FURTHER PROCEEDINGS

The trial court did not reach Nelson's argument that the arbitration agreement was unconscionable and should not be enforced pursuant to *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83. Ordinarily, the gateway issues of the enforceability of an arbitration agreement, which includes questions of unconscionability, are decided by the trial court. (*Balandran v. Labor Ready, Inc.* (2004) 124 Cal.App.4th 1522, 1530.) Consequently, we remand for further proceedings to allow the trial court to address that defense in the first instance. (*Ibid*.)

IV.     COSTS ON APPEAL

Generally, "the party prevailing in the Court of Appeal in a civil case … is entitled to costs on appeal." (Cal. Rules of Court, rule 8.278(a)(1).) A discretionary exception to the rule allows the appellate court, in the interests of justice, to "award or deny costs as it deems proper." In this case, we conclude the interests of justice support denying Queen Mining, the prevailing appellant, its costs on appeal.

About two weeks after Queen Mining filed this appeal, its attorney filed a mandatory Judicial Council form APP-004, Civil Case Information Statement, with this court. Item 2 of part II of the form contains a box followed by "This appeal is entitled to calendar preference/priority on appeal (*cite authority*):" This item was left blank. (See Cal. Rules of Court, rule 8.100(g) [appellant must serve and file a *completed* form APP-004].) A properly completed form would have marked the box and cited Code of Civil Procedure section 1291.2—that statue mandating proceedings brought under the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) be given calendar preference over other civil cases. (*Ramirez v. Golden Queen Mining, LLC* (2024) 102 Cal.App.5th 821, 829; see *Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 204, fn. 4 ["Arbitration proceedings are entitled to calendar preference in all courts"]; Eisenberg et al., *Cal. Practice Guide: Civil Appeals and Writs* (The Rutter Group 2023) ¶ 5.204, pp. 5-77 to 5-78 [arbitration proceedings expressly granted appellate preference].)

In addition, Queen Mining's attorney explicitly misstated the law in two applications for extension of time to file the appellant's opening brief. (See Cal. Rules of Court, rule 8.60(c) [applications for extension].) Both applications incorrectly stated: "(6) This case is not entitled to priority." (See Cal. Rules of Court, rule 8.63(b)(6) [factors that must be considered in determining good cause for an extension include whether the case is entitled to priority].)

We again conclude the form APP-004 omission and the misstatements of law in the applications justify Queen Mining bearing its own costs on appeal despite qualifying

19.

as a prevailing appellant under California Rules of Court, rule 8.278(a)(2).  (See *Ramirez v. Golden Queen Mining, LLC*, *supra*, 102 Cal.App.5th at pp. 829, 838; see also, Bus. & Prof. Code, § 6068, subd. (d); Rules Prof. Conduct, rule 3.3(a)(1).)

## DISPOSITION

The order denying the motion to compel arbitration is reversed.  The matter is remanded to the trial court for further proceedings not inconsistent with this opinion.

In the interests of justice, the parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.